

# Missouri Court of Appeals

### Southern District

### Division Two

STATE OF MISSOURI,                    )
                                      )
    Plaintiff-Respondent,          )
                                      )
v.                                    )    Nos. SD 35314 & 35315
                                      )    Filed: March 14, 2019
SCOTT RANDALL COLLINS,                )
                                      )
    Defendant-Appellant.           )

### APPEAL FROM THE CIRCUIT COURT OF GREENE COUNTY

Honorable Thomas E. Mountjoy, Circuit Judge

## **AFFIRMED**

Following a bench trial, Scott Collins (Defendant) was convicted as a prior and persistent offender of the class D felony of making a terrorist threat and the class C felony of victim tampering. *See* §§ 574.115, 575.270.[1] On appeal, Defendant presents a single point challenging the sufficiency of the evidence to support his conviction for victim tampering. Finding no merit in his point, we affirm.

In a court-tried criminal case, the court's findings have the force and effect of a jury verdict. Rule 27.01(b); ***State v. Crawford***, 68 S.W.3d 406, 408 (Mo. banc 2002). "Accordingly, the standard used to review the sufficiency of the evidence in a court-tried

---

[1] All statutory references are to RSMo Cum. Supp. (2013) unless otherwise specified. All rule references are to Missouri Court Rules (2018).

and a jury-tried criminal case is the same." ***State v. Loughridge***, 395 S.W.3d 605, 607 (Mo. App. 2013). Our review of sufficiency of the evidence is limited to "whether the State has introduced adequate evidence from which a reasonable finder of fact could have found each element of the crime beyond a reasonable doubt." ***State v. Lammers***, 479 S.W.3d 624, 632 (Mo. banc 2016). An appellate court "considers all evidence in the light most favorable to the verdict and grants the State all reasonable inferences. Contrary evidence and inferences are disregarded." ***Id***. (citation omitted). We do not weigh the evidence. ***State v. Claycomb***, 470 S.W.3d 358, 362 (Mo. banc 2015). Instead, we defer to the fact-finder's "superior position to weigh and value the evidence, determine the witnesses' credibility and resolve any inconsistencies in their testimony." ***State v. Lopez-McCurdy***, 266 S.W.3d 874, 876 (Mo. App. 2008). Viewed from that perspective, the following evidence was adduced at trial.

On October 2, 2015, David Crom (Crom) was a security officer at Mercy Hospital when he responded to "an agitated person" call. The agitated person was Defendant, who was standing outside the building. Defendant was upset because he hadn't been given a prescription that he thought he should have received. The person who brought Defendant to the hospital was trying to get him to leave. Crom explained to Defendant where he would have to go to get the prescription. Defendant left.

Later that same day, Cara Chiappinelli (Chiappinelli), a psychiatric evaluation nurse at Mercy Hospital, received a page. She returned a call to Defendant. Chiappinelli did not recall any previous interactions with Defendant. According to Chiappinelli, Defendant said that "one of our psychiatrists" had left prescriptions for Defendant on the "A Unit." Chiappinelli put Defendant on hold and called the A Unit. She was told that they did not have any prescriptions for Defendant. After Chiappinelli told Defendant that

2

there were no prescriptions for him on the A Unit, Defendant became angry and threatening. He asked Chiappinelli to write the prescriptions, but she told him that she was not authorized to do so. Defendant told her that, if she did not write the prescriptions for him, he was "going to get [his] shotgun and come down there and shoot you all."

Because Defendant had threatened Chiappinelli during the call, she contacted Crom. When he arrived in the emergency room, Chiappinelli was still on the phone with Defendant. She handed the phone to Crom because she had been unable to calm Defendant. Defendant identified himself on the phone and said that he had been there earlier in the day to get a prescription. Defendant said that he was going to come to the hospital and "shoot everyone in the hospital." Crom recorded part of the phone conversation. Defendant said that he had "double-aught buck fucking loaded and ready to go." At the end of the phone call, Defendant said, "Just be ready[.]" Crom interpreted that comment to mean that Defendant was on his way to the hospital. Defendant told Crom, "You'll be the first one I shoot in the head[.]"

Crom contacted his supervisor, Michael Merenghi (Merenghi), because Crom thought that the threats made by Defendant were credible. Merenghi was a shift supervisor for security at Mercy Hospital. He spoke with Crom about the phone call from Defendant. As a result of the threats that Defendant made, Merenghi had the exterior doors of the hospital locked, except for the entrance to the emergency room. Security officers were posted at all the exterior doors. Merenghi and another officer provided security at the emergency room door. There were about 1600 people in the hospital, plus visitors. The hospital doors were later unlocked when Merenghi received information from the Springfield Police that Defendant had been located and that he was not near the hospital.

3

Thereafter, Defendant was charged with making a terrorist threat in violation of § 574.115. Crom testified at Defendant's preliminary hearing.

On December 24, 2016, Crom was called to a room in the hospital about an agitated person who was with Greene County deputies. When Crom got to the room, he discovered that Defendant was the agitated person. Crom's body camera recorded part of the interaction between Crom and Defendant. When Defendant said, "You're going to get yours," Crom interpreted that comment to mean Defendant was going to get back at Crom for having to go to jail on the charge of making a terrorist threat. Defendant said that he knew where Crom lived and that he "had been walking past [Crom's] house every day[.]" Crom was concerned that Defendant might injure Crom's family or do something to his home because Defendant had said he knew where Crom lived. Defendant also said, "You're the one that lied on the stand against me[,]" and that he was going to "get" Crom for lying on the stand. As a result of these statements by Defendant, Crom was afraid of Defendant and upgraded his home-security system. Crom was concerned about these new threats against him, which were made because of his involvement in Defendant's prosecution.

Detective Annesha Umbarger (Det. Umbarger) investigated the October 2, 2015 incident at Mercy Hospital. She spoke with Defendant on October 5, 2015. He admitted that, during a phone conversation with Chiappinelli and Crom, he had threatened to shoot people at Mercy Hospital.

Defendant's single point challenges only his conviction for victim tampering. The following additional facts are relevant to his point. The terrorist-threat charge against Defendant stated, in relevant part:

> The Prosecuting Attorney of the County of Greene, State of Missouri, charges that the defendant, in violation of Section 574.115, RSMo,

4

committed the class D felony of making a terroristic threat … in that on or about October 2, 2015, in the County of Greene, State of Missouri, the defendant knowingly communicated to [Crom] a threat to cause a shooting at Mercy Hospital, an incident involving a danger to life, by stating on the phone to [Crom] that he had guns and would come to Mercy Hospital and start shooting, and the defendant did so with reckless disregard of the risk of causing the closure of any portion of Mercy Hospital, a building.

In relevant part, the victim-tampering charge against Defendant stated:

The Prosecuting Attorney of the County of Greene, State of Missouri, charges that the defendant, in violation of Section 575.270, RSMo, committed the class C felony of victim tampering … in that on or about December 24, 2016, in the County of Greene, State of Missouri, the defendant said to D Crom that the defendant knew where D Crom lived, and that the defendant was going to "get" him for "lying on the stand," and such conduct was a substantial step towards the commission of the offense of Victim Tampering against D Crom, *a person acting on behalf of the victim of the crime of Making a Terroristic Threat* that was charged as a felony in Greene County case number 1531-CR06273-01 on or about October 2, 2015, and the defendant engaged in such conduct for the purpose of committing such Victim Tampering.

(Emphasis added.)

Defendant's point challenges only the sufficiency of the evidence to support his conviction for victim tampering. He begins his argument by noting that "victim" is defined as "any natural person against whom any crime is deemed to have been perpetrated or attempted[.]" § 575.010(11); *see* **State v. Brashier**, 301 S.W.3d 598, 600 (Mo. App. 2010). Relying on that definition, Defendant contends the victim-tampering charge was predicated on the October 2, 2015 terrorist-threat offense. According to Defendant, "Mercy Hospital was the 'victim,' and where a 'victim' must be a natural person by statute, Crom could not have been 'a person acting on behalf of the victim' of the crime of making a terroristic threat[.]" Based upon this premise, Defendant argues that the evidence was insufficient to support his conviction. We disagree.

Insofar as relevant here, a person commits the crime of victim tampering "if, with purpose to do so, he … attempts to prevent or dissuade any person who has been a victim

5

of any crime or a person who is acting on behalf of any such victim from: … (2) Causing [an] information to be sought and prosecuted or assisting in the prosecution thereof ….” § 575.270.2(2).  The purpose of the victim-tampering law is to criminalize conduct that would deter victims from reporting crimes to which they have been subjected.  *State v. Brashier*, 301 S.W.3d 598, 601 (Mo. App. 2010); *see also State v. Hedge*, 793 S.W.2d 478, 480 (Mo. App. 1990) (overall purpose of Chapter 575 is to promote orderly administration of justice by proscribing anything which hinders witnesses’ “willingness to speak the truth before any court or body charged with the enforcement of our laws”).

We conclude the State presented sufficient evidence for a reasonable fact-finder to find Defendant guilty of tampering with a person acting on behalf of a victim.  There was ample evidence that Defendant had made threats by telephone to shoot everyone in the hospital.  That included nurse Chiappinelli, a specific natural person toward whom the threat was expressly directed.  Crom’s testimony at the preliminary hearing was made on behalf of the many natural persons in the hospital who were endangered by Defendant’s threats of violence.  Defendant reacted to Crom’s testimony about these initial threats by making *new* threats directly to Crom.  Evidence of these new threats included Crom’s testimony and Crom’s body-camera footage, which recorded part of the interaction between Crom and Defendant.  Defendant told Crom: (1) “You’re the one that lied on the stand against me”; (2) “You’re going to get yours”; and (3) Defendant knew where Crom lived and that he had walked past Crom’s house every day.  As a result of Defendant’s statements, Crom was fearful for his safety and upgraded his home-security system.  Defendant’s threats against Crom were made because of his involvement in Defendant’s prosecution.

6

The foregoing evidence was sufficient to support the reasonable inference that Defendant made threats to Crom because he had testified on behalf of many victims (including himself) by assisting the State in its prosecution of Defendant for making a terrorist threat. Because Crom had testified at the preliminary hearing and was an important witness at the trial, the trial judge could reasonably infer that Defendant's threats were intended to dissuade Crom from assisting in the prosecution by providing further testimony. Therefore, the evidence was sufficient to support Defendant's conviction for tampering with a victim.

Defendant's argument is based on the premise that Mercy Hospital was the victim of the terrorist-threat charge made against him. That premise is false. Insofar as relevant here, § 574.115 states:

> 1. A person commits the crime of making a terrorist threat if such person *communicates a threat to cause an incident or condition involving danger to life …*
>
> (3) With reckless disregard of the risk of causing the evacuation, quarantine or *closure of any portion of a building,* inhabitable structure, place of assembly or facility of transportation ….
>
> 2. Making a terrorist threat is a class C felony unless committed *under subdivision (3) of subsection 1 of this section in which case it is a class D felony ….*

§ 574.115.1-.2 (emphasis added).[2] "Section 574.115 proscribes threats of violence or false public alarms made to terrorize or cause serious public inconveniences." ***State v. Tanis***, 247 S.W.3d 610, 614 (Mo. App. 2008); ***State v. Metzinger***, 456 S.W.3d 84, 91 (Mo. App. 2015). The first element of the offense is the communication of a threat to cause an incident or a condition involving "danger to life." ***Browder v. State***, 326 S.W.3d 33, 35-36 (Mo.

---

[2] As of January 1, 2017, § 574.115.1(3) is separately addressed as "[m]aking a terrorist threat, second degree" in § 574.120 RSMo (2016).

7

App. 2010). This required element demonstrates that the purpose of this statute is to protect natural persons. *See Tanis*, 247 S.W.3d at 614 (defendant's report of explosives in his truck parked in the middle of a busy college campus was a condition involving danger to life creating serious alarm for personal safety and/or serious public inconvenience).[3]

Here, Defendant's threats posed a danger to the lives of more than 1600 people who were at the hospital when the threats were made. All of these natural persons were the victims of the terrorist-threat offense. One effect of those threats against those victims was the closure of Mercy Hospital. Building closure only affects the class of the offense, depending on the defendant's mental state in causing the closure. *See* § 574.115.1(2)-(4); MAI-CR 3d 328.30 (2015 ed.). Therefore, proof of how and why the closure occurred was a necessary element, but only to establish the class of the offense. Such required proof did not make the hospital building the victim of the crime. Because Defendant's legal argument rests on a false premise, his point lacks merit and is denied.

The judgment of the trial court is affirmed.


JEFFREY W. BATES, J. – OPINION AUTHOR

WILLIAM W. FRANCIS, JR., P.J. – CONCUR

MARY W. SHEFFIELD, J. – CONCUR

---

[3] The charging document for making a terrorist threat tracked the language of MACH-CR 28.30 and charged the statutory elements of that offense. A charging document is generally sufficient "if it is substantially consistent with the forms of indictments or informations which have been approved by the Missouri Supreme Court." *Griffin v. State*, 185 S.W.3d 763, 765-66 (Mo. App. 2006); *see* Rule 23.01(b).